UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                          :

UNITED STATES OF AMERICA           :

                         :

        -v.-               :     16 Cr. 559 (DLC)

                         :

COREY BROWN, *et al.*,         :

                         :

            Defendants.    :

                         :

------------------------------------------------------------x

## THE GOVERNMENT'S MOTION *IN LIMINE*

JOON H. KIM
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Margaret Graham
Brooke Cucinella
Jordan Estes
Assistant United States Attorneys
     -Of Counsel-

# **TABLE OF CONTENTS**

BACKGROUND ........................................................................................................... 1

    A.   History of SMM ................................................................................... 1

    B.   SMM's Drug Dealing Activity ............................................................. 2

    C.   SMM's Acts of Violence ..................................................................... 4

    D.   The Murder of Vincent Davis .............................................................. 6

ARGUMENT .............................................................................................................. 8

  I.    The Court Should Allow the Government to Introduce Evidence of Other Acts ............... 8

    A.   Applicable Law .................................................................................... 8

    B.   The Other Acts Evidence Is Offered for a Proper Purpose ......................................... 10

    i.   The Government Seeks to Offer Other Act Evidence with Respect to the SMM Enterprise and Corey Brown's Previous SMM Convictions and Bad Acts ...................... 11

    ii.   The Government Seeks to Offer Evidence of Josnel Rodriguez's Prior Bad Acts .... 14

    C.   The Other Acts Evidence is Not Subject to Exclusion Under Rule 403 ................... 15

  II.   The Court Should Admit Various Co-Conspirator Statements Made in Furtherance of the Conspiracy ......................................................................................................... 16

  III.  The Court Should Admit Certain Rap Videos as Evidence of the Enterprise ................. 18

    A.   Applicable Law .................................................................................. 19

    B.   Discussion .......................................................................................... 20

CONCLUSION .......................................................................................................... 25

The Government respectfully submits this motion for rulings in advance of trial permitting the Government to introduce: (1) evidence of the history of the Sex, Money, Murder ("SMM") gang, including evidence from defendant Corey Brown's prior federal case, *United States* v. *Corey Brown*, 01 Cr. 490; (2) evidence of defendant Josnel Rodriguez's criminal history; (3) certain statements made by SMM co-conspirators in furtherance of the conspiracy; and (4) rap videos where members of SMM rap about the activities of the gang.

## BACKGROUND

### A.  History of SMM

Defendants Brown, Rodriguez, and Christopher Canada are members of SMM, a violent subset of the Bloods gang that has trafficked heroin and crack cocaine and engaged in numerous acts of violence in the Bronx since the mid-1990s.  SMM was founded by Peter Rollack, a/k/a "Pistol Pete," in the early 1990s, when it established a dominant presence in the crack cocaine trade in the Soundview section of the Bronx.  Brown's older brother, "Bear," was one of the original and most respected members of SMM, which gave Brown credibility in the enterprise. After Bear died in a motorcycle accident the late 1990s, Brown rose in status and became a high-ranking member of SMM.

Prospective members of SMM are invited to join the gang by high-level members of the gang, like Brown, who have what is known as a "green light," *i.e.*, the ability to invite others into SMM.  Upon joining, SMM members are taught the "oath," the "lineup," and the "codes."  The oath is an oath SMM members are directed to memorize ("Under Pistol Pete we rise/ we keep our 2 guns stacked high/ I do solemnly swear/ never to take the stand against my man"), and, along with demonstrating loyalty to the gang, obligates members to never cooperate or testify

against other members of SMM.  The "codes," are a series of SMM-specific codes, and include a specific series of call and response statements designed to allow other SMM members to recognize each other.  For example, if an SMM member says "64 grams" to another SMM member, the SMM member is supposed to respond "dolla dolla bill."  Lastly, the "lineup" is a list of the top five leaders of SMM; there is a separate lineup for federal prison (known as the "Royal Flush"), state prison, and the streets.  Brown, who had risen in stature following the death of his brother "Bear" and assumed leadership after his release from prison in late 2009, was the leader of SMM on the streets of the Bronx until his arrest in August 2016.

The disciplinary system in SMM is called "the plate."  A high-ranking SMM member can put any other SMM member "at the plate" or "on the plate," for snitching, stealing, or disrespecting the gang.  Every other SMM member is then obligated to "violate" the SMM member "at the plate," through slashing, physical violence, stabbing, and murder.  SMM members risk being placed "on the plate" themselves if they fail to "violate" someone when they have the opportunity.  But if an SMM member commits an authorized act of violence, his status in the gang will rise.

### B.  SMM's Drug Dealing Activity

SMM members made money by, among other things, selling illegal drugs within Castle Hill and Soundview, as well as in upstate New York, among other places.  For example, from approximately 2011 to 2016, Rodriguez and "JC," another SMM member, controlled the crack cocaine drug trade in Castle Hill.  They allowed lower level SMM members, such as Canada, to sell in Castle Hill.  Other SMM members and associates sold drugs in Soundview from "Cozy Corner," a corner located on Rosedale Avenue and Randall Avenue in the Bronx.  Following his

2001 to 2009 incarceration for selling crack cocaine, Brown (who was on supervised release until October 2015) was largely involved in selling marijuana, which was supplied by Troy Heath, a/k/a "Killa T," an SMM member.  If there were any turf wars over the drug trade, it was understood that SMM members would provide protection to each other.

SMM members also trafficked crack cocaine, cocaine, and heroin in upstate New York, where they sold the drugs out of the houses of addicts.  For example, in 2013, Rodriguez transported crack cocaine to Monticello, where he worked with local drug dealers to sell the narcotics.  Rodriguez was supplied by SMM member Hasan Harris, a/k/a "Hocus," who was getting the narcotics from his brother, Khalil Harris, a/k/a "Dolla," who was also in SMM.  Also in 2013, a cooperating witness ("CW-1"), traveled with SMM members "OP" and "G-Baby" to Messina, New York on several occasions to sell crack cocaine and heroin.  The crack cocaine "OP" sold upstate was supplied by SMM members Doug Thomas, a/k/a "Tha God" and Richard James, a/k/a "Rated R."

In addition, in 2015, CW-1 supplied heroin to Canada, who took the heroin to Oneonta, New York to sell.  CW-1 bought the heroin from Heath, a/k/a "Killa T."  After CW-1 was arrested in 2015, Devon Jones, a/k/a "D-Jones" began picking up heroin from Heath on CW-1's behalf, and he gave it to another SMM member, Nestor Ventura, a/k/a "Kiko," who transported it upstate for sale.

3

### C.  SMM's Acts of Violence

SMM members committed violent acts to protect the reputation of SMM, to protect fellow SMM members, and to enforce SMM's rules.  For example, the Government expects to prove at trial the following acts of violence, among others:

- In or about 2013, CW-1, Brown, and "Devil," another SMM member, were at a pizzeria, when a drunk individual ('Individual-1') made disrespectful comments about SMM.   In response, CW-1, Brown, and Devil assaulted Individual-1.

- While in Castle Hill, Rodriguez and other SMM members saw an individual ("Individual-2") who cooperated against Hassan Harris in a state criminal case. Rodriguez and the SMM members approached Individual-2 and assaulted him because of his cooperation with law enforcement.

- Brown, CW-1, and other SMM members called an Uber driver to pick them up one day, and the driver who came to pick them up happened to be an SMM member ("Individual-3").  Brown told Individual-3 he was on "five love" with SMM, which meant he was on probation.  Brown was upset that Individual-3 had not been active with SMM recently.   Brown told Individual-3 that he should drive "homies" like Brown for free and that one of the SMM members in the car had a gun.  When Individual-3 stated that he did not want to drive for free or drive someone with a gun, Brown punched Individual-3, dragged him out of the car, and forced him to salute Brown and the other SMM members present.

4

- Brown and Ventura, a/k/a "Kiko" assaulted an individual ("Individual-4") while out one night with other SMM members.  Brown told CW-1 that he tried to kill Individual-4, but that because Individual-4 did not die, he decided to leave Individual-4 alone going forward.

- Before Brown's prior federal arrest, he was selling crack cocaine at a location in the Bronx.  Other SMM members also sold crack at the same intersection, but were only allowed to sell in a certain area.  The best area was reserved for Brown.  When an SMM member tried to sell in Brown's area, two other SMM members attacked him and beat him up.

- In or about 2015, CW-1 and Thomas, a/k/a "Tha God" saw a group of male individuals—one of whom had a boxcutter—surround Rodriguez, as if they planned to jump him.  CW-1 and Thomas approached the group.  Thomas spoke up for Rodriguez and punched one of the individuals.  CW-1 grabbed the boxcutter and cut one of the individuals with him.  Rodriguez also punched some of the individuals.

- In or about January 2015, Rodriguez and "Shelly O," an SMM member, were involved in a shooting with a rival gang where shots were fired.

- Shortly after getting into a fight at Stevenson Commons, an apartment building in the Bronx, Rodriguez returned to the area and fired several shots.

- In or about 2007, Rodriguez shot "G-Baby," an SMM member.

- In or about 1998, Brown initiated several individuals into SMM.  As part of their initiation, those individuals had to attack another individual until they drew blood.

- In or about 1998 or 1999, an individual ("Individual-5") was selling crack cocaine in Academy Gardens and attempting to undercut the SMM members selling crack there, including Brown. Brown and several other SMM members, at Brown's direction, fired guns at Individual-5 and Individual-5's partner. Individual-5 was not hit, but was successfully intimidated from selling crack cocaine in the area.

### D. The Murder of Vincent Davis

Vincent Davis, a/k/a "Venom," was an SMM member who was charged along with Brown in *United States* v. *Sean Carr, et al.*, 01 Cr. 490 (TPG). Both pled guilty to narcotics offenses and served prison sentences. Davis was released before Brown, and, upon his release, Davis continued his activities with the SMM and assumed a leadership role, cultivating a group of loyal followers who viewed him as the head of SMM for the Soundview area. Brown's return to the neighborhood in 2009 ignited an internal power struggle over the leadership of SMM that intensified as time went on, with some SMM members pledging loyalty to Davis and others pledging loyalty to Brown. This power struggle culminated in an incident in or about the during which one of Brown's loyalists, Troy Heath, a/k/a "Killa T," and Davis got into a physical altercation, during which Heath attempted to cut Davis with a razor. As Brown attempted to intervene in the fight, Davis was able to wrangle the razor away from Heath, and used it to slash Brown's face. No charges were ever brought in connection with the slashing. After Brown was cut, Davis fled from the scene.

In late 2011, CW-1 returned home from two years on Rikers Island. Immediately upon his return, Brown began grooming CW-1 to retaliate against Davis. For example, the day he returned, Brown picked up CW-1 and took him to a club. While they were out, Brown told CW-

6

1 about the fight involving Brown, Heath, and Davis.  Brown showed CW-1 the long vertical scar down the left side of his face and explained that Davis had cut him during the fight and, essentially, that it was humiliating.   Brown made clear to CW-1 that someone needed to "take care" of Davis—*i.e.*, murder him.  Brown emphasized that he could not do it himself because the murder would "come back to [him]."  CW-1 told Brown that he "had his back," since Brown had brought CW-1 in to SMM.

After that initial conversation, Brown continued to emphasize to CW-1 that he wanted Davis killed.  On July 15, 2012, CW-1 and Rodriguez saw Davis on City Island with other SMM members, including an individual believed to carry out violence on behalf of Davis.  This was the first time that CW-1 had actually encountered Davis since CW-1's return to the neighborhood from Rikers.  Davis invited CW-1 to a cookout, which CW-1 found suspicious, since Davis knew that CW-1 was an associate of Brown.  CW-1 drove Rodriguez to the cookout, dropped Rodriguez off so that he could locate Davis, and called Brown.  During this call, Brown confirmed that he wanted CW-1 to murder Davis.  CW-1 obtained a gun and called Rodriguez to establish that Davis was at the house party.  CW-1 then returned to the location of the party and called Rodriguez, who came outside and joined CW-1.  CW-1 and Rodriguez moved the car, to conceal the vehicle.  Rodriguez then stayed in the vehicle, with the motor running, in case they needed to leave the scene quickly.  CW-1 waited outside the party, and when he saw Davis exiting the house, he shot him multiple times.  He then returned to the car, and he and Rodriguez drove away.

## ARGUMENT

### I.   The Court Should Allow the Government to Introduce Evidence of Other Acts

At trial, the Government intends to introduce other bad act evidence to establish, among other things, the existence of SMM, the enterprise charged in Count One of the Indictment, to assist the jury in understanding the background of SMM, and as proof of the defendants' motive, opportunity, intent, knowledge, intent, and/or absence of mistake or accident with respect to the charges in the Indictment.   All of this evidence should be admitted.   *First*, this evidence is admissible as direct proof of the crimes alleged in the Indictment—from the narcotics conspiracy and RICO enterprise underlying Count One, the charges relating to the murder of Vincent Davis, and the felon in possession charges against defendant Corey Brown.   Among other things, much of the other acts evidence demonstrates the origin, existence and structure of the charged enterprise, and thus the criminal relationship between Brown and his co-conspirators—including, significantly, the basis for the mutual trust between the members of the SMM enterprise.   *See United States* v. *Thai*, 29 F.3d 785, 812-13 (2d Cir. 1994) (evidence of uncharged crimes is admissible as direct evidence to show the "existence and structure" of the conspiracy).   *Second*, this evidence is admissible under Federal Rule of Evidence 404(b) for a number of purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Fed. R. Evid. 404(b).

### A.   Applicable Law

The Second Circuit follows an "'inclusionary approach' to the admission of prior-act evidence," in which "evidence of prior crimes, wrongs, or acts is admissible for *any* purpose other than to show a defendant's criminal propensity."   *United States* v. *LaSanta*, 978 F.2d 1300, 1307

8

(2d Cir. 1992) (citations and internal quotations omitted) (emphasis in original), *abrogated on other grounds*, 526 U.S. 559 (1994); *accord United States* v. *Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  Indeed, evidence of uncharged criminal activity is not even considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial."  *United States* v. *Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (citations omitted) (alterations in original).

Likewise, prior dealings among a defendant and his co-conspirators, and others, that provide the explanation for, and essential background of, the charged offenses that were eventually committed by the defendant are not considered "other crimes" evidence under Rule 404(b). Moreover, if such evidence explains the relationship of trust between a defendant and his co-conspirators and provides the jury with the complete story of the crime, it is not "other act" evidence and is admissible as direct evidence of the conspiracy itself.  *See, e.g.*, *United States* v. *Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and "made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"), *abrogated on other grounds by United States* v. *Parkes*, 497 F.3d 220, 230 (2d Cir. 2007); *United States* v. *Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (citations omitted).

9

Furthermore, evidence that is offered to show the existence and structure of a charged conspiracy is evidence of the crime itself and not "other acts" evidence. *See Thai*, 29 F.3d at 812-13 (evidence of uncharged robberies and assaults is admissible as direct evidence to show the "existence and structure" of the conspiracy); *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged.").

Finally, evidence of other acts is admissible under Rules 404(b) and 403 of the Federal Rules of Evidence if it is: (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States* v. *Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston* v. *United States*, 485 U.S. 681, 691-92 (1988)). The District Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994); *United States* v. *Brady*, 26 F.3d 282, 286 (2d Cir. 1994). In short, under the Second Circuit's "inclusionary approach" to the admission of other act evidence, evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity. *United States* v. *Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).

### B.  The Other Acts Evidence Is Offered for a Proper Purpose

The Government expects to offer at trial evidence of the history of the Sex, Money, and Murder enterprise, including the historical structure and leadership of the Enterprise, as well as evidence of bad acts—including convictions—that occurred either before the beginning of the

10

charged conspiracy or during the conspiracy itself.  Each example of other act evidence is being offered for a proper purpose.

> **i.**     ***The Government Seeks to Offer Other Act Evidence with Respect to the SMM Enterprise and Corey Brown's Previous SMM Convictions and Bad Acts***

At trial, the Government intends to offer evidence establishing the history of the SMM enterprise, including evidence relating to the origins of the enterprise and the changes in leadership over time.  This evidence—which will include testimony from multiple cooperators and/or former SMM members, the testimony of at least one former law enforcement agent, and videos, pictures and/or audio recordings taken during a previous investigation into SMM (including depictions of Corey Brown engaged in and/or discussing narcotics trafficking and/or acts of violence on behalf of SMM)—is direct evidence of the structure of charged RICO enterprise, and will aid the jury in understanding the importance of rank and status within it.

This evidence is also crucial to aiding jury's understanding of the codes and symbols used by enterprise members to communicate at or around the time of the charged conspiracy—codes and symbols that may otherwise be meaningless.   For example, after an individual is brought in to SMM, he is provided with the "line up"—or the list of SMM leadership, both in the streets and in prison.  Without understanding the legal history of SMM, including the fact that its founders (including Peter Rollack) are currently in prison, it would be difficult if not impossible to comprehend the significance of the "Royal Flush" line up and the codes the enterprise uses to communicate to avoid the detection of law enforcement, much less the significance of things like "Team Rollack" sweat pants that defendant Josnel Rodriguez wears in at least one picture that will be presented to the jury.   Thus, along with serving as direct evidence of the enterprise charged in

Count One, evidence of the history of SMM, including the convictions of former high-ranking members, will be crucial to the jury's understanding of the leadership structure of SMM, and how Brown assumed the leadership position in the Bronx following his return home from prison in 2009.

The Government may also seek to admit evidence, through the use of testimony (from both cooperating witnesses and law enforcement agents) and recordings, of a January 1, 2001 kidnapping Brown participated in with other SMM members when a non-SMM individual attempted to infringe on SMM's territory, and specifically, tried to sell drugs in an area believed to be controlled by SMM. While this other act evidence falls outside the time period of the enterprise conspiracy charged in Count One, it too establishes the history and background of the charged enterprise, as well as Brown's role in that enterprise and his relationship to certain co-conspirators. In *Thai*, 29 F.3d 785, the defendants were convicted of various crimes, including murder, robbery, and conspiracy charges, in connection with their participation in an organized and violent street gang known as "Born to Kill" ("BTK") or the "Canal Boys." On appeal, the *Thai* defendants contended that the trial court erred in admitting evidence of uncharged crimes—including evidence of a brutal assault of a former BTK member—as overt acts in furtherance of the conspiracy. The *Thai* defendants claimed that those uncharged crimes should have been excluded under Rule 404(b). The Second Circuit rejected this argument, holding that evidence of uncharged robberies and assaults was admissible to show the "existence and structure the BTK enterprise, as to the leadership roles played by [the defendants], and as to the discipline imposed by the BTK leaders on the rank-and-file members." 29 F.3d at 813. Here, the Government will argue that although the conspiracy to kill Davis did not begin until 2011,

12

Brown was a member of the enterprise long before then, and his prior relationships and acts helped lead to his rise among the leadership within SMM. This kidnapping, which involved co-conspirators to the charged conspiracy, goes directly to the history of the conspiracy, and shows the ongoing nature of the relationship of the co-conspirators over time, as they took over the leadership of SMM.

To that end, the Government also seeks to introduce Brown's prior narcotics conviction from 2002, in which he pled guilty to distributing crack cocaine in violation of Title 18, United States Code, Section 841(b)(1)(A). Specifically, the Government will seek to introduce Brown's plea allocution, as well as his judgment of conviction and sentence to establish, among other things, his relationship with his co-defendants and the motivation for the charged crimes. In *United States* v. *Pitre*, 960 F. 2d 1112 (2d Cir. 1992), the Second Circuit affirmed the District Court's admission of a defendant's prior narcotics convictions under Rule 404(b) because they were "relevant to informing the jury of the background of the conspiracy charged, in that such evidence could help explain to the jury the relationship between [the co-conspirators]." 960 F. 2d at 1119. Here, this evidence is admissible for multiple reasons, including background to the charged crimes; direct evidence of Brown's membership in the charged enterprise; direct evidence of the fact that he is a prior felon (with respect to the felon-in-possession charge); and to show motive for the charged murder of Vincent Davis. As described above, Brown ordered the murder of Davis after he returned home from doing a federal bid following his conviction in 2002. Davis— who was arrested, charged, and convicted in the same investigation as Brown— was released prior to Brown, and was able to establish a leadership position on the streets prior to Brown's release. This led to the power struggle that ultimately led Brown to order the murder of

13

Davis.  Without this key background evidence, the jury will struggle to understand Brown's
motivation for ordering the murder.

> ### ii.    *The Government Seeks to Offer Evidence of Josnel Rodriguez's Prior Bad Acts*

For the same reasons described above, the Government intends to offer evidence of
defendant Josnel Rodriguez's prior bad acts.  For example, on April 30, 2016, Rodriguez and
Canada were drinking Ciroc in a park in the Castle Hill projects with other SMM
members.  Rodriguez told the officers that his name was "Anthony Melenciano" and was
arrested for false personation and obstruction of governmental administration.  The others were
given summons for being in a park without a child.   The Government will introduce evidence of
this incident at trial to show Rodriguez and Canada's association with other SMM members and
connection to the Castle Hill projects.

Additionally, on August 8, 2013, a trooper with the New York State Police stopped a
speeding car, in which Rodriguez was a passenger, on Route 17 near Walkill, New
York.  Rodriguez and the two others in the vehicle were travelling in the direction of Monticello,
where Rodriguez was selling crack cocaine at the time.  After pulling over the car, the trooper
smelled marijuana and called for backup.  Rodriguez told the trooper that his name was
"Anthony Melenciano" and gave an address in Monticello.  The trooper asked Rodriguez to exit
the car and attempted to frisk Rodriguez.  As the trooper felt what he believed to be narcotics in
Rodriguez's waistband, Rodriguez began to resist:  he pushed off the car, elbowed the trooper,
and tried to run.   The trooper and Rodriguez then struggled on the ground, and during the
struggle, Rodriguez grabbed something from his waistband and tossed it.  The trooper eventually

subdued Rodriguez and recovered the bag he had thrown, which contained approximately 4 grams of crack cocaine.  The troopers also recovered a bag containing approximately 61 grams of crack cocaine and approximately 2 grams of marijuana from another passenger in the car.   Rodriguez pleaded guilty on October 18, 2013, to criminal possession of a controlled substance in the seventh degree, to wit, cocaine, and was sentenced on November 25, 2013, to time served.  The Government will introduce evidence of this incident and Rodriguez's conviction at trial as direct evidence of Rodriguez's trafficking of crack cocaine in Monticello, New York, as part of the racketeering conspiracy.

### C.  The Other Acts Evidence is Not Subject to Exclusion Under Rule 403

As demonstrated above, the proffered evidence is highly relevant and probative of the charges in the Indictment. Moreover, the defendants will not be unfairly prejudiced by the admission of such evidence. There is thus no basis to exclude it under Rule 403 of the Federal Rules of Evidence.

As explained above, much of the proof is highly probative because it is inextricably intertwined with the participation of the defendants and their co-conspirators in the charged conspiracies, and is necessary to explain the background of the charged acts and the relationships among the co-conspirators.  Indeed, much of the proffered evidence—such as evidence of the prior convictions and incarceratory terms of SMM leadership, as well as evidence concerning the codes and structure of SMM on the streets and in prisons— is in fact, direct proof of the charged offenses. Given the fact that these and similar acts were part and parcel of the defendants' participation in the charged conduct with their co-conspirators, admission of the evidence would not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the

15

evidence.  Indeed, when weighed against the evidence's substantial probative value, the danger of *unfair* prejudice is slight.  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  A "[d]efendant must show some *undue* prejudice, apart from the prejudice implicit in Rule 404(b) evidence."  *United States* v. *Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988) (emphasis added).  Furthermore, the "fact that evidence may be 'damning' does not render it inadmissible."  *Id.* (citing *United States* v. *Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972)).  Any potential prejudice to the defendants is far from unfair or undue.  In any event, the Court can guard against any potential prejudice to the defendants with a limiting instruction to remind the jury that they are not on trial for any offense other than the crimes charged.  *See United States* v. *Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker* v. *Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'— indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions.").  Such an instruction will reduce the risk that the jury will use the proffered evidence for an improper purpose.

## II.  The Court Should Admit Various Co-Conspirator Statements Made in Furtherance of the Conspiracy

At trial, the Government expects that various cooperating witnesses will testify about statements made to them by SMM members while the cooperating witnesses themselves were SMM members or associates.  These are co-conspirator statements admissible under Rule 801(d)(2)(E).  These statements fall into broad categories, including: (i) prison "kites" or

16

messages, sent to incarcerated members of SMM to keep them updated about SMM activities and leadership; and (ii) updates that SMM members who were at liberty received about the current leadership of SMM.

These statements are admissible pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, which provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy.  *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy.  Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).  Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness,"

17

*id.*; *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *Thai*, 29 F.3d at 813; *see also Maldonado-Rivera*, 922 F.2d at 958; *United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

The statements that the Government will introduce at trial fall under the co-conspirator statements exception, as they are designed to foster trust and cohesiveness, as well as inform SMM members of the status of the conspiracy.  Cooperating witnesses will testify that, as an SMM member, it is important to have up-to-date information of the oaths and slogans of SMM, as well as the current line-up of SMM leadership.  An SMM member can "g-check" another individual claiming to be an SMM member by asking him to recite an oath, or the current line-up.  If the other individual does not respond with the correct information, he is presumed to be lying about his SMM membership, and can be beaten up, or even stabbed or shot.  Given this tradition within SMM, as well as the well-settled case law on co-conspirator statements, the Government submits that the statements of its cooperating witnesses should be admitted.

### III. The Court Should Admit Certain Rap Videos as Evidence of the Enterprise

The Government seeks to offer at trial excerpts of certain music videos in which SMM members make statements relating to and in furtherance of the racketeering enterprise, and to elicit testimony from cooperating witnesses about the music videos.  The statements in the videos are admissible as co-conspirator statements under Rule 801(d)(2)(E).

18

### A.  Applicable Law

"Rap lyrics are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice."  *United States* v. *Pierce*, 785 F.3d 832, 841 (2d Cir. 2015).  In *Pierce*, which involved racketeering and other charges against members of a violent gang operating in the Bronx, the Second Circuit affirmed the district court's decision to admit rap videos to show the defendant's "association with [the racketeering enterprise]" and his "animosity toward [a rival gang]."  *Id.*  The rap video in question depicted the defendant and other gang members and contained lyrics about shooting at rival gang members. *See id.*

In reviewing the district court's decision to admit the rap video, the Second Circuit explained that "the rap video [evidence was] relevant, [its] probative value was not outweighed by the danger of unfair prejudice, and [the defendant's] First Amendment rights were not implicated when the district court admitted the evidence."  *Id.*; *see also United States* v. *Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of profane and violent rap recordings over challenge, under Federal Rule of Evidence 403, where lyrics were probative of defendant's participation in narcotics conspiracy); *United States* v. *Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti-Terrorism Unit, which tortured Sierra Leoneans in Liberia).  As the Second Circuit explained in *Pierce*, "[t]he video helped establish [the defendant's] association with members of the enterprise and his motive to participate in the charged conduct against members of the [rival gang]."  *Id.*  The Second Circuit accordingly affirmed the district court's decision

19

admitting the rap video.  *Id.*; *see also United States* v. *Applins*, 637 F.3d 59, 80 (2d Cir. 2012) (in

racketeering gang case, affirming conviction over sufficiency of the evidence challenge, relying

in part on probative value of rap lyrics introduced at trial); *United States* v. *Rivera*, No. 13 Cr. 139

(KAM), 2015 WL 1757777, at *7-*8 (E.D.N.Y. April 17, 2015) (in racketeering case, admitting

certain YouTube videos over objections and setting forth procedures governing admission of

videos at trial).

### B. Discussion

Here, the Government seeks to admit excerpts from the following rap videos:

1.  "Blazing Billy World," a rap video performed by Hassan Harris, a/k/a "Hocus,"

and other SMM members. The video features a number of SMM members, including Rodriguez,

Hassan Harris, and Khalil Harris, a/k/a "Dolla."  Throughout the video, SMM members display

SMM gang signs and make shooting motions with their hands.  The vast majority of the rap

lyrics contain references to SMM.   For example, the refrain of the song is "it's a blazing billy

world."  Cooperating witnesses will testify that SMM members are known as "blazers," so the

entire song is about membership in SMM.  Indeed, on at least two occasions, the rap lyrics

<u>expressly</u> reference SMM:  "sex, money, murder, yeah that's the f***ing family"; "sex, money

murder; 64 grams know the slogan."

2.  "All About My Blazers," a rap video performed by Hassan Harris.  The video

features Hassan Harris, "JC," "Rome," "Shelly O," and other SMM members.  Throughout the

video, SMM members display SMM gang signs, and the vast majority of the lyrics, including the

title, contain references to SMM.  For example, the lyrics repeatedly state "I'm in that club

Rollacking with my blazers"—a reference to Pete Rollack, the founder of SMM.  Harris also

raps "free all my blazers/f*** these snitches/f*** these haters," a reference to freeing SMM

members who are incarcerated.   Harris goes on to rap "free CB/free DO /I miss y'all/y'all some

real homies," while the video flashes pictures of Brown (who is known as "CB") and Rodriguez

(who is known as "DO").

       3.   "Ooouuu," a rap video performed by Hassan Harris.  At the beginning of the

song, Harris disparages cooperating witnesses: "All these n*****s out here acting like they

tough, they gangsta, acting like they putting in work.  As soon as s***hit the fan, they run into

the man, to the feds, and they snitch."  Harris then goes on to discuss an unnamed cooperating

witness in connection with Brown ("CB") and Rodriguez ("DO"):  "This n****'s claiming

Blood, he a dub though/say he a killa but he never let his gun go/n****'s clapping then they rap

they f***ing bozos/shout CB, shout DO, free the bros though."   Later in the song, Harris

references SMM:  "Castle Hill, that's my neighborhood/S double M, yeah that's the blazerhood."

As Harris says that, individuals in the background state "Sex Money."   Finally, Harris raps

about assaulting family members of a cooperating witness: "you f***ing with a rat then you a

rat/y'all going to have me dressed in all black/go hit his mama, hit his b**** and all that."

       4.   "Whut up," a rap video performed by Hassan Harris.  The video features

Rodriguez, JC, and other SMM members.  The video shows Rodriguez making what appears to

be the Blood gang sign with his hands.  Harris also raps the following about Rodriguez ("DO"):

"I tell DO go get him, he gone."

       5.   "Roll Call," a rap video performed by Hassan Harris.  The video features Harris,

JC, Rome, and other SMM members.   The video contains numerous SMM references.  For

example, Harris raps "64 grams, dolla dolla bill," a call and response statement of SMM

members.   As another example, Harris says "somebody tell them free the homey Pistol Pete"—a

reference to Pete Rollack.   There are also numerous references to "blazers" and "blazing"

throughout the video.

6.   "25 to Life," a rap video performed by Hassan Harris.   During the video, Harris

shouts out to various high-level SMM members, including Brown ("CB"):   "whut up Beamo/ un

Gambino/ Sherm, CB, Gutterman, Casino."

7.   "Dolla, Dolla Bill," a rap video performed by Hassan Harris.   The beginning of

the video flashes photographs of Brown and Rodriguez.   Throughout the video there are

references to SMM, and the refrain, "64 grams, dolla dolla bill," is an SMM call and response.

8.   "In New York," a rap video performed by the Milliano Boyz (Jamel Davis, a/k/a

"Pooty" and "Johnny" who are SMM members).   The beginning of the video shows what

appears to be a meeting involving SMM members Brown, Heath, a/k/a "Killa T," "Sanai,"

"Johnny," and Davis, where Heath says "now it's time for us to take over."   Later in the video,

Brown and Davis are seen smoking what appears to be marijuana.   Davis and Johnny repeatedly

makes SMM hand signs during the video.   In addition, there are SMM references in the video.

For example, there is a reference to "blazers," which is slang for SMM members.

9.   "Oh Lord," a rap video performed by the Milliano Boyz.   The video features

multiple SMM members, including Heath, "Sanai," "L Boggie," and Nestor Ventura, a/k/a

"Kiko."   It also shows "Cozy Corner," one of the locations where SMM members and associates

sell drugs.   The lyrics expressly reference Brown ("CB") and Heath ("Killa T" or "KT"):   "Hit

Lefty like yo I need a whole zip/hit CB yo I need the four-fifth/hit KT yo I need a whole

brick/call Su like yo I need a whole strip."   Cooperating witnesses will testify that "four-fifth" is a reference to a .45 caliber firearm.

10. "You Know That," a rap video performed by the Millano Boyz.  The video features multiple SMM members at Soundview, including "OP," "Sanai," Heath, and Thomas, a/k/a "Tha God."  The SMM members repeatedly make SMM hand signs in the video.

11. "It Could Go Down," a rap video performed by the Milliano Boyz.  The video features SMM members, such as Davis, "Johnny," and "Cuzzo," the brother of Vincent Davis. The SMM members repeatedly make SMM hand signs, and there are multiple references to SMM in the video.  For example, Davis raps: "Where I'm from Pete block, that's the pound/where my young boys kill for a pound/if you snitch then you food you a clown/deuce deuce four four let you down/hollow tips flying out that trey pound/and if the feds come I won't make a sound."   Cooperating witnesses will testify that "Pete block" is a reference to Pete Rollack; "pound" is a reference to Soundview; "food" is a reference to being on the "plate"; "deuce deuce" is a reference to a .22 caliber firearm; "four four" is a reference to a .44 caliber firearm; and the "feds" is a reference to federal law enforcement officers.

12. "In My Bag," a rap video performed by the Milliano Boyz.  The video features SMM members, including Davis and "Johnny."  There are multiple references to SMM in the video.  For example, the lyrics reference Brown ("CB") and SMM ("blazers"):  "Got some blazers in the crew/hit up CB, hit up Su."  Later in the song, there is another reference to Brown and other SMM members:  "Got some blazers in the team/hit up God, hit up KT, hit up Su, hit up CB/that's a f***ing murder C."   "KT" refers to Heath, a/k/a "Killa T"; and "God" refers to Thomas, a/k/a "Tha God."

The statements in the above-described videos, just like the statements in *Pierce*, are admissible as co-conspirator statements in furtherance of the racketeering conspiracy.  The rap lyrics further the conspiracy in a multitude of ways.  *First*, the lyrics and videos glorify membership in the gang, thus promoting cohesion in the gang, helping to recruit new members, and motivating active members to continue in SMM.  *Second*, the lyrics reinforce the rule that cooperating with law enforcement is forbidden ("if you snitch then you food you a clown/deuce deuce four four let you down/hollow tips flying out that trey pound/and if the feds come I won't make a sound"), and they inform SMM members of the consequences cooperation can bring ("you f***ing with a rat then you a rat/y'all going to have me dressed in all black/go hit his mama, hit his b**** and all that").  To that end, the lyrics venerate incarcerated SMM leaders known to have not cooperated with law enforcement ("somebody tell them free the homey Pistol Pete"; "whut up Beamo/ un Gambino/ Sherm, CB, Gutterman, Casino").  *Finally*, the graphic descriptions of violence in the lyrics and videos bolster SMM's reputation as a violent gang that must be respected by rivals.  For all of these reasons, the videos and the statements therein should be admitted as co-conspirator statements in furtherance of the conspiracy.

Moreover, the videos are highly probative of Brown and Rodriguez's association with the enterprise.  Brown and Rodriguez are featured in videos with other SMM members, where the lyrics repeatedly reference SMM.  Other videos show SMM members asking to "free" Brown, Rodriguez, and other incarcerated SMM members.  Still other videos show SMM members rapping about "hitting up" Brown, including for a firearm.  The videos thus demonstrate Brown and Rodriguez's close association with SMM.  Further, admission of the rap videos will not cause undue prejudice.  Although the videos contain profanity, references to violence, and

24

depictions of violence, the content of the videos is no more inflammatory than the charged crimes—a murder and a racketeering conspiracy involving narcotics trafficking and violence. *See United States* v. *Herron*, 10 Cr. 0615 (NGG), 2014 WL 1871909, at *5 (E.D.N.Y. May 8, 2014) (introduction of rap videos did not cause undue prejudice where videos were no more inflammatory than charged crimes, which included three murders).

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion *in limine* in its entirety.

Dated:       New York, New York
             May 12, 2017

                              Respectfully submitted,

                              JOON H. KIM
                              United States Attorney
                              Southern District of New York


                     By:   /s/
                              Margaret Graham
                              Brooke Cucinella
                              Jordan Estes
                              Assistant United States Attorneys
                              Southern District of New York
                              (212) 637-2923/6833/2543

25