# MANDATE

17-3283(L)
*United States v. Brown; Rodriguez*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 06 2021

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 11th day of June, two thousand twenty-one.

PRESENT:   DENNIS JACOBS
          RICHARD J. SULLIVAN*,
                  *Circuit Judges.*
_____

United States of America,
         *Appellee*,

         v.                                     Nos. 17-3283(L); 17-3285

---

* Circuit Judge Dennis Jacobs replaced the late Circuit Judge Ralph K. Winter on the panel in December 2020. *See* 2d Cir. IOP E(b). The third member of the panel, Circuit Judge Peter W. Hall, recently passed away. The two remaining panelists, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

**MANDATE ISSUED ON 10/06/2021**

Christopher Canada,
  *Defendant*,

Josnel Rodriguez, Corey Brown,
  *Defendants-Appellants.*
  _____

| | |
|---|---|
| For Appellant Rodriguez: | ANDREW H. FREIFELD, Law Office of Andrew Freifeld, New York, NY. |
| For Appellant Brown: | BENJAMIN SILVERMAN (Andrew G. Patel, *on the brief*), Patel & Shellow LLP, New York, NY. |
| For Appellee: | MARGARET GRAHAM, Assistant United States Attorney (Jordan Estes, Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY. |

Appeal from judgments of the United States District Court for the Southern District of New York (Cote, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

Corey Brown and Josnel Rodriguez (collectively, "Defendants") appeal from the October 6, 2017 judgments of conviction of the United States District

1   Court for the Southern District of New York (Cote, *J.*).  A jury found Brown guilty

2   of conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d) (Count 1);

3   murder in aid of racketeering activity in violation of § 1959(a)(1) (Count 2);

4   conspiracy to commit murder in aid of racketeering activity in violation of

5   § 1959(a)(5) (Count 3); use of a firearm in relation to a crime of violence in violation

6   of § 924(j) (Count 4); and being a felon in possession of a firearm in violation of

7   § 922(g)(1) (Count 5).  The jury found Rodriguez guilty of Counts 1 and 3, the only

8   counts presented against him at trial.  The district court sentenced Brown

9   principally to life imprisonment and Rodriguez to 240 months' imprisonment.

10   Defendants raise several challenges in appealing their convictions.  We

11  conclude that all of Defendants' challenges lack merit, and therefore affirm the

12  judgments of the district court.  We assume the parties' familiarity with the

13  underlying facts, procedural history, and issues on appeal, which we recite only

14  as necessary to explain our decision.

15                          **I. Sufficiency of the Evidence**

16   Defendants assert there was insufficient evidence to convict them of certain

17  charges. "We review *de novo* a district court's denial of a [Federal Rule of Criminal

18  Procedure] Rule 29 motion, applying the same standard of sufficiency [of the

3

evidence] as the district court." *United States v. Florez*, 447 F.3d 145, 154 (2d Cir. 2006). "We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). "[W]e will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "However, the defendant's heavy burden is not insurmountable," as "at the end of the day, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005) (internal quotation marks omitted).

**A. Evidence of Rodriguez's Intent to Commit Murder**

Rodriguez argues that he should not have been convicted of Counts 1 and 3 because there was insufficient evidence for the jury to find that he shared an intent

with the shooter, Christopher Lopez, to commit murder – a required element for both Counts.  We disagree.

At trial, Lopez testified that he called Rodriguez, met him outside a party, and told him that he had a gun with which he was going to shoot Vincent Davis.  Rodriguez told Lopez that Davis was about to leave the party.  Rodriguez then got in Lopez's car, directed Lopez to drive around the corner, and waited in the car while Lopez returned to the party to kill Davis.  After Lopez killed Davis, Lopez got in the car where Rodriguez was waiting, and Rodriguez directed him to Rodriguez's home, where Rodriguez stored the murder weapon.  Based on this testimony and other evidence, it was reasonable for the jury to conclude that Rodriguez knew what Lopez was planning and that he assisted Lopez in the murder.

**B. Evidence of Brown's Knowledge that a Gun Would Be Used in the Murder**

Brown argues that his conviction on Count 4 should be reversed because there was insufficient evidence that he knew Lopez would use a gun to kill Davis.  Section 924(j) requires that "an unarmed accomplice . . . ha[ve] foreknowledge that his confederate will commit the offense with a firearm."  *Rosemond v. United States*, 572 U.S. 65, 78 (2014) (internal quotation marks omitted).  As the Supreme Court

explained in *Rosemond*, foreknowledge "means knowledge at a time the accomplice can do something with it – most notably, opt to walk away." *Id*.

After stating that a weapon is "the obvious method of choice to kill someone in the middle of night at a party," the district court described the relevant evidence as follows:

> [T]he weapon of choice for [Sex Money Murder ("SMM"), the gang to which the defendants allegedly belonged,] was a gun. The history, culture, hierarchy, disciplinary code, symbols, signals, and greetings of SMM centered on the glorification of guns. . . . SMM's call – "two guns up" – was expected to elicit the response – "triple homicide". Instead of a handshake, members greeted each other by forming their hands into the shape of a gun and touching those "guns" together. SMM's nickname – "Blazing Billies" – conveyed the following: "Blazing, that means when you shoot, you shoot. And then billy, billies is bad, so Blazing Billies." When individuals join SMM, the initiation oath includes the promise to "ride with my two guns stacked high." One of the gang's rap videos had the lyric: "If there is beef, we send a shot, make sure that, that body drop." One rap video proclaimed Brown, who was known within SMM as "CB", as a source for guns. Its lyrics included [the words] "hit CB, yo I need the four-fifth", meaning call Corey Brown for a .45 caliber handgun. Brown's entire back is covered by a tattoo with the words Sex, Money, & Murder above the image of two guns and the words Blazing Billy. Brown told his former probation officer, who testified at trial, that if SMM had been responsible for a shooting in the Soundview neighborhood of the Bronx, a neighborhood in which SMM operated, then "it would have been multiple shots as opposed to one shot at the person," and that the wall in the area "would have been riddled with bullets instead of one shot." Moreover, Lopez and Brown helped each other to purchase guns.

6

Brown App'x 488–89.

Brown argues on appeal that "[t]attoos and third parties' nicknames cannot prove beyond a reasonable doubt advance knowledge that a murder would be committed with a firearm." Brown Reply Br. 29 (internal citations omitted). We are unpersuaded by this argument in light of the ample evidence from which the jury could have inferred that Brown knew that his fellow gang member would use a gun to commit murder, and we therefore decline to overturn the jury's verdict.

## II. Admissibility of Cell Site Evidence Against Rodriguez

Rodriguez also argues that the government violated Federal Rule of Criminal Procedure 16(a)(1)(G) by not disclosing its cell site expert until the night before the last day of trial. Rule 16(a)(1)(G) provides that:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G). "When the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate. The court's determination will not be set aside absent abuse

of discretion." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997) (internal citations omitted). A "reversal will only be warranted if the nondisclosure results in substantial prejudice to the defendant." *United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir. 1990). To show substantial prejudice, a defendant "must demonstrate that the untimely disclosure of the statement adversely affected some aspect of his trial strategy." *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994). "In assessing that question, the court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof." *United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993).

Here, the district court found no bad faith as the government notified the defense as soon as it became aware that Rodriguez's cell site records might still be available. The court noted that the government had already provided the defense with a written summary that generally explained the cell site data evidence. The court also found that the evidence was highly probative because it supported Lopez's description of the events that took place after the shooting and suggested that Rodriguez participated in the murder. Finally, the court found that Rodriguez would not be prejudiced because he would have ample opportunity for cross

8

1   examination. We agree that the district court did not exceed the bounds of its

2   discretion in reaching these determinations.

3   Rodriguez further argues that the cell site evidence should have been

4   excluded because the evidence was obtained without a search warrant. To be sure,

5   Rodriguez's cell site records were obtained pursuant to a court order issued under

6   the Stored Communications Act before the Supreme Court decided *Carpenter v.*

7   *United States*, which held that the Fourth Amendment requires a search warrant

8   supported by probable cause before investigators may acquire cell-site data from

9   wireless carriers. 138 S. Ct. 2206, 2220–21 (2018). But the procedure followed by

10  the police here, while inconsistent with the requirements later stated in *Carpenter*,

11  was consistent with the third-party doctrine and Second Circuit precedent at the

12  time of the search. *See United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017) ("The

13  Supreme Court has long held that a 'person has no legitimate expectation of

14  privacy in information he voluntarily turns over to third parties,' including phone

15  numbers dialed in making a telephone call and captured by a pen register."

16  (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979))). As the Supreme Court

17  has recognized, "searches conducted in objectively reasonable reliance on binding

18  appellate precedent are not subject to the exclusionary rule." *Davis v. United States*,

9

564 U.S. 229, 232 (2011).  Citing *Davis*, our Court has declined to exclude cell site evidence when a search of records was made without a warrant pre-*Carpenter* where the cell site information was obtained through a subpoena issued in conformity with the Stored Communications Act.  *See United States v. Zodhiates*, 901 F.3d 137, 143–44 (2d Cir. 2018).  Accordingly, we decline to apply the exclusionary rule to Rodriguez's cell site data.

### III.  Evidence of Brown's Prior Bad Acts

Brown next argues that the district court erred by allowing the government to introduce evidence of uncharged acts involving drug sales, assaults, and a shooting that happened when Brown was a member of SMM as a teenager in the 1990s.  He contends that because the prior acts occurred in the 1990s, they cannot be direct evidence that he was involved in a conspiracy or that SMM existed fifteen years later.  Brown asserts that such evidence was merely proof of propensity and was not offered for any proper purpose, in violation of Rule 404(b) of the Federal Rules of Evidence.  He also argues that the evidence should have been excluded under Rule 403 because any probative value of such evidence was far outweighed by its prejudice.

We review the district court's "evidentiary rulings for abuse of discretion, and recognize that district courts enjoy broad discretion over the admission of evidence." *United States v. McDermott*, 245 F.3d 133, 140 (2d Cir. 2001) (internal citations omitted). "A district court judge is in the best position to evaluate the admissibility of offered evidence. For that reason, we will overturn a district court's ruling on admissibility only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." *United States v. Gasperini*, 894 F.3d 482, 489 (2d Cir. 2018) (internal quotation marks omitted). And when we review a ruling under Rule 403, "we must review the evidence maximizing its probative value and minimizing its prejudicial effect." *McDermott*, 245 F.3d at 140 (internal quotation marks omitted).

Brown was charged under the Racketeering Influenced and Corrupt Organizations Act ("RICO") with conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), which required proof of "the existence of a criminal enterprise in which [Brown] participated." *United States v. Mejia*, 545 F.3d 179, 206–07 (2d Cir. 2008) ("Where . . . the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise,

11

including evidence of uncharged crimes committed by the defendants themselves, is admissible 'to prove an essential element of the RICO crimes charged – the existence of a criminal enterprise in which the defendants participated.'") (quoting *United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007)). The district court admitted the evidence of Brown's past acts, which he had committed as a member of SMM, as direct evidence of the crime charged rather than as "prior act" evidence under Rule 404(b), finding that:

> It is highly relevant that a person belonged to the charged enterprise at an earlier period of time. It is probative as to whether he was . . . a member at a later period of time. Similarly, it's highly relevant and probative that he once had a role as a street seller and now has a role at a later period of time and . . . is benefitting from the street sales made by the organization.

Brown App'x 167. The court also found little risk of prejudice because Brown essentially admitted membership in SMM.[1] We agree, and therefore hold that the district court did not abuse its discretion in admitting the evidence of Brown's

---

[1] The potential for prejudice was further diminished by the district court's limiting instruction, which directed the jury to consider the evidence of prior acts before 2011 only for "whatever light . . . it sheds, if any, on the existence of SMM, on [Brown's] membership in SMM, the kinds of activities in which SMM engages, and the relationship among SMM members," and for no other purpose. Brown App'x 195; *see United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009) (finding that the probative value of a defendant's prior crimes was not substantially outweighed by the danger of unfair prejudice, particularly in light of the court's careful limiting instruction to the jury).

prior acts, which is admissible as proof of "the existence of a criminal enterprise in which [Brown] participated." *See Matera*, 489 F.3d at 120 (affirming district court's admission of evidence of uncharged murders committed by non-defendant members in the same criminal enterprise which was offered to prove "an essential element of . . . various racketeering charges under [RICO]").[2]

## IV. Search of Brown's Home

Finally, Brown argues that the evidence obtained during the search of his home should have been suppressed because the police officers could not have reasonably believed that Brown was present when they entered his home to execute the arrest warrant. He also argues that the district court erred when it found that Brown's wife gave consent to the agents to look for Brown in the home, which the court found provided "a separate and independent basis" for upholding the initial entry. Brown App'x 71. Because we find that the agents acted lawfully

---

[2] Evidence relating to Brown's past associations and activities with SMM and its members was also admissible "to provide background for the events alleged in the indictment." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 US.S. 821 (1988)). Such evidence "may be admitted to show . . . the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *Daly*, 842 F.2d at 1388).

13

in entering to execute the arrest warrant, we need not reach whether Brown's wife consented to this initial entry.[3]

In assessing a district court's ruling on a suppression motion, we review the court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Bohannon*, 824 F.3d 242, 248 (2d Cir. 2016). Whether law enforcement officers had reason to believe, under the totality of circumstances, that the subject of an arrest warrant was present at the time of entry into a residence is a mixed question of law and fact that we review *de novo*. *Id.*

An arrest warrant predicated on probable cause "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 249 (quotation marks omitted)

---

[3] The district court also noted that there was "no dispute that Mrs. Brown gave consent for a full-scale search of her home after the security sweep was concluded." Brown App'x 71; *see also id.* at 68 (providing that the full-search consent was not at issue before the court); Brown Br. at 13 (noting that the parties did not dispute that, after the agents initially entered the apartment to look for Brown to execute his arrest, they then obtained consent from Mrs. Brown to re-enter and search the apartment). Brown raises in his reply brief a challenge to the voluntariness of his wife's consent to conduct the full search, which he argues was tainted by the unconstitutional initial entry. "We generally treat arguments raised for the first time in a reply brief as waived." *United States v. George*, 779 F.3d 113, 119 (2d Cir. 2015); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (explaining that "arguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."). In any event, because we find that the initial entry was lawful, Brown's taint argument is ultimately immaterial.

14

(explaining that "[i]n these circumstances, entry does not require the further authorization of a search warrant"). This "reason to believe" standard "is not a particularly high standard, but it does require specific and articulable facts that, taken together with rational inferences drawn therefrom, provide a particularized and objective basis for thinking that the arrest-warrant subject may be present within specific premises." *Id.* at 255; *see also United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) (holding that the police do not have to "conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence"). In assessing reasonableness, we view the facts "in their totality and in a commonsense manner," *Bohannon*, 824 F.3d at 257, remaining mindful of the "factual and practical considerations of everyday life" in evaluating a record for reasonable belief, *id.* at 255 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

We conclude that the agents had reason to believe that Brown was in his home at the time of their initial entry. In arguing otherwise, Brown highlights that the agents knew from their review of video footage that Brown had left the apartment around 1:00 or 1:30 a.m. and, from their stakeout positions, did not see him return. Brown asserts that the agents "knew" based on their physical

15

surveillance that he was not home, as indicated by Agent Salter's decision to relieve the SWAT team. Brown Br. 34. We decline to treat as dispositive the facts that agents did not see Brown come home or that at one point – hours before entry – they decided to relieve the SWAT team while continuing to conduct surveillance. Rather, the totality of the facts supports the conclusion that the agents had a particularized and objective basis to think that Brown "might be within" his home when they entered after 9:00 a.m. *Bohannon*, 824 F.3d at 255 (quotation marks omitted).

First, although the agents saw footage of Brown leaving earlier in the evening, they nevertheless had reason to think Brown would return by the morning, an inference that was strengthened by later developments. The property in question was Brown's own home and current residence, and the timing of his departure suggested to agents that he was likely to return by early morning. Salter testified that Brown's 1:00 a.m. departure informed his initial instinct that Brown was going "out partying" and would probably return in the next several hours. *See* Brown App'x 55 (Salter explaining that, in his experience, when individuals go out at night they typically return home to sleep around "6, 7, in the morning" after

16

the clubs or bars close).[4] As the district court observed, the fact that Brown had been present in the home "within hours" of the time agents entered weighs in favor of finding that they had reason to believe he could be home. *See id.* at 152.

Second, there was reason to believe that law enforcement might have missed seeing Brown return home. Salter's testimony provided additional details that, along with the rational inferences drawn therefrom, support the reasonableness of his belief that Brown might have returned home unobserved. For starters, around 5:00 a.m., there was a gap between the viewing of surveillance video and the installation of physical surveillance. Moreover, the focus and scope of the agents' physical surveillance changed over time. At the outset of their stakeout, the agents were looking specifically for someone dressed all in white driving a Cadillac Escalade. They did so while monitoring the Co-op City complex – an enormous urban setting comprised of several high-rise apartment buildings with multiple entries – "from a distance," watching the "comings and goings of vehicles" on the "different roads coming in and out" of the area.[5] *Id.* at 60, 64; *see also id.* at 55 (Salter

---

[4] Police can be expected to know that last call in New York City bars is 4:00 a.m. and that 4:30 a.m. is hard close. *See* New York State Liquor Authority, http://sla.ny.gov/location/new-york (last visited June 9, 2021).

[5] Co-op City has a population of approximately 50,000, about the same size as Binghamton, New York, which has a university. *See* Co-op City Cooperative Living and Affordability,

17

testifying that the agents "couldn't be certain that [Brown] made it back in" as they were watching "a large building"); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 840 (1975) (noting that Co-op City is "massive," housing tens of thousands of people on a 200-acre site); *Berlin v. Renaissance Rental Partners, LLC*, 723 F.3d 119, 125 n.6 (2d Cir. 2013) (explaining that Co-op City is "the world's largest co-op complex, spanning 35 buildings").

After Brown's co-defendants were arrested elsewhere, around 6:00 a.m., Salter inferred that Brown might have learned of those arrests and surmised his own impending arrest, given Salter's experience that "word travels quickly" on the street. Brown App'x 55. That possibility furthered Salter's belief that Brown might have come home undetected; he testified that in his experience, officers sometimes "located people going home to say their good-byes [and] see their children" after learning that they could soon be arrested. *Id.* at 59. The facts known to Salter at the time he was making the entry decision, including the realization that Brown could have easily changed clothes or switched cars after learning of his co-defendants' arrests, revealed the potential limitations of the

---

https://coopcitynyc.com (last visited June 9, 2021).

18

1   prior surveillance and supported the reasonableness of Salter's belief that Brown

2   could have returned home undetected.

3   We have never required officers to prove with certainty that the subject of

4   an arrest warrant is at home before they may enter a residence to execute a

5   warrant; rather, our precedents allow agents to rely on common-sense

6   assumptions about human behavior to support a reasonable belief. *See Harper v.*

7   *Leahy*, 738 F. App'x 716, 718–19 (2d Cir. 2018) (finding that officers had "ample

8   reason to believe" the subject of an arrest warrant would be at a certain apartment,

9   even after his mother told them her son was not home, because various documents

10  identified the address as his residence, his mother was present at the time of entry,

11  and the time was around 7:00 a.m.); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir.

12  1995) (holding that the defendant's unemployment and tendency to sleep late

13  supported the reasonable belief that he was in an apartment when police executed

14  an arrest warrant).

15  When Agent Salter arrived at the complex around 9:00 a.m. and considered

16  whether to enter Brown's apartment, he had before him a constellation of facts.

17  Those, in sum, included the circumstances under which Brown left his apartment

18  (which suggested he would return), the circumstances that developed in the hours

19

before entry (which suggested that Brown might return covertly), the likely limitations of the surveillance (which suggested that the agents surveilling such a large area might have missed Brown by focusing on a particular description), and the practical considerations of everyday life (which suggested that people are generally in their own homes in the morning, especially after having returned from a night out). In light of this record, which reflects the common-sense cues and inferences we have held sufficient in other cases, we find that the agents had reason to believe that Brown might be in his own apartment when they entered around 9:00 a.m. to execute the warrant. Accordingly, the district court properly denied Brown's motion to suppress evidence retrieved from that search.

We have considered all of Defendants' arguments and find them to be without merit. Accordingly, for the reasons stated, the judgments of the district court are **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

*[signature]*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit
*[signature]*

20